THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
Y. PARK, Defendant-Appellant.

Second District   No. 2—91—0969

Opinion filed May 28, 1993.—Rehearing denied July 20, 1993.

Sherman C. Magidson, of Magidson & Sullivan, of Chicago, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and Marshall M. Stevens, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

A jury convicted defendant, Y. Park, of committing criminal sexual assault upon his minor daughter (Ill. Rev. Stat. 1989, ch. 38, par. 12—13(a)(3)), and the court sentenced him to six years' imprisonment. On appeal defendant claims that numerous evidentiary errors and ineffective assistance of counsel deprived him of a fair trial.

Defendant was charged by indictment with four counts of criminal sexual assault. Counts I, II, and III alleged that on or about October 21, 1990, defendant committed various acts of sexual penetration on his daughter, S.P. Count IV charged that "on or about between July, 1989 and October, 1990," defendant placed his penis into the victim's vagina. Ultimately, a jury acquitted defendant as to the first three counts of the indictment but found him guilty on count IV.

The following, as related at trial, are the facts underlying the charges. Fourteen-year-old S.P. testified that her father began sexu-

ally abusing her, in the form of fondling, when she was about 10 years old and the family was living in Cook County. He had initiated oral sex with her in 1988, before her twelfth birthday. S.P. indicated that her father demanded oral sex activities from her as a condition of allowing her various privileges, such as going to the mall or the movies.

According to S.P.'s testimony, the first time her father had sexual intercourse with her was late in June 1990, after the family had moved to Hawthorne Woods. Her mother was entertaining guests in the kitchen, and the other family members were on the lower level of the house. S.P. had gone upstairs to her bedroom. Her father followed her into the room and closed and locked the door. Various sex acts then occurred, including penile penetration which took place as her father lay on the floor.

S.P. related another incident which she said occurred late in the summer of 1990. It was on a Sunday afternoon while her mother was out. This time she went to her father's bedroom at his request. Her father turned up the volume on the TV set because her brother's room was right next door. Again, penile penetration occurred.

S.P. claimed to have been sexually assaulted again in August 1990, when her father, who was a doctor, took her to his office for a school physical examination. There were no patients in the office at the time. Following the examination, her father asked her to get on the examining table, where he removed her clothes, performed various sex acts, including sexual intercourse. The school report of this physical was signed by defendant as both the physician and parent. The form had been signed and dated in July, rather than August when, according to S.P., the examination had been done. S.P. explained that she had received the form early in July and that her father signed it the day she received it. However, they did not actually go to her father's office for the necessary shots until August. Also, it was brought out on cross-examination that defendant had two offices, both of them located in Cook County. S.P. testified she had been examined and assaulted at the Lawrence Street office, while the physical examination report form contained the Division Street office address under defendant's signature. S.P. indicated that Division Street was the office where her father spent most of his hours and where he normally signed reports. Defendant denied that the report was filled out at either office. He testified he filled it out at home. He also testified that he did not actually give S.P. a physical examination before filling out the form, but filled it in from his own knowledge.

The next incident S.P. testified about occurred in October 1990. Her mother was in New York at the time. On October 20 her father gave her permission to go to her high school homecoming celebration on the condition that she see him the next day. Sometime after 10:30 p.m. the next evening, at her father's request, S.P. went to his bedroom. She turned up the volume on the television and got into the bed. Her father performed cunnilingus, digital penetration, and penile penetration on her. At home that night, but in different parts of the house, were S.P.'s brothers, ages 13 and 17, and her sister, age 17.

On Thursday, November 8, 1990, S.P. ran away from her parents' home and went to the home of a friend, Rachelle Ko. When asked at trial why she ran away, S.P. responded initially that her father was making sexual advances toward her. The State's Attorney then asked why she ran away on the particular day that she did. After stating that she had not had her period for the last two months and that she was afraid she was pregnant, S.P. added that, at the time, she felt if she stayed any longer, her father "would have an opportunity" since her mother was planning a trip out of the country. The witness also testified that her father was the only person with whom she had engaged in sexual relations. S.P.'s testimony regarding her period was impeached when the doctor who examined her after she was found testified that S.P. was just coming off her menstruation.

While she was at Rachelle Ko's house, S.P. wrote the following letter to her father:

"Dear Father—

I am writing to you to accomplish a few things. You may understand why I ran away and what I'm running away from. Since I kept trying to talk to you in person, I learned you'd never listen to me and only think of yourself. Now that I'm gone and you seem concerned, hopefully, you'll listen. I don't care if you tell Mom *everything*. I'm sick of lying to her. You and Mom should have never of had kids. You *know* nothing about how to raise children. You don't *molest, rape, beat, pressure,* or *force* things on your children. I think you know that's wrong. I don't hate you; I just don't love you anymore. You have a problem; you're very sick in the head. You should seek psychological help. You don't have to make things worse. You can help yourself become a better person to father your children. You still have four kids that need to be fathered. I know I wasn't the only one you *touched*. I saw

you touch others. I'm so ashamed. I'm trying to live with my sick, infested body because of you. I'm telling you now that I will never come back to live with you and Mom. Don't try to find me because you will only regret doing so. I can have your doctor's license suspended and have a court order against you for what you did. I guess you will still bother my friends even though they don't know anything. Believe me, it BETTER STOP. Don't assume your life won't be ruined because I have made sure it will be if you don't stop. All I want is for you to leave me alone. Don't worry, I won't ask anything from you. You have minus one daughter. I'm sorry I have to make you hate me. It was and is the only way to make you stop touching (hurting) me.

Your ex-daughter,

[S.P.]

P.S.—Hopefully, you've thought about your 'problem.' You better leave [S.] alone. I suppose now that you won't have daughters to *Molest* and *RAPE*, you'll turn to your patients or other young girls. Don't try IT! You'll only regret it. I'll make sure. There's an easy solution: talk about it with a psychologist."

S.P. showed the letter to Rachelle Ko on Sunday.

On Monday the police came to Rachelle Ko's home looking for S.P., who had been reported missing by her parents. S.P. hid in the basement and Rachelle Ko lied to the police, telling them S.P. wasn't there. Rachelle Ko then went out. When she returned, S.P. was gone. Rachelle Ko testified that later that evening she found S.P.'s duffel bag in the basement, looked through it, and found the letter to S.P.'s father. She took the letter and had it photocopied. Then she called the police, showed the original letter to the responding officer, and gave him the photocopy. She replaced the original in S.P.'s duffel bag. Rachelle Ko figured that, after S.P. was found, the police could use the letter as evidence.

S.P. arrived at the home of another friend around 1 a.m. Tuesday. Her parents located her there, and picked her up and drove her home. The next day, after reading the missing person report on S.P. and S.P.'s letter to her father, Officer Graham of the Hawthorne Woods police department interviewed S.P. at her high school. Defense counsel elicited from the officer that S.P. stated to him that she had been sexually molested by her father.

S.P. was subsequently admitted to the pediatric ecology program at Mt. Sinai hospital. The program deals with various issues

of child maltreatment. It is a multidisciplinary program in which teams of specialists evaluate children admitted to the unit. The final diagnosis for each child is based on input from the various members of the team. Dr. Sharon Ahart, a pediatrician specializing in child maltreatment, was codirector of the program. Dr. Ahart interviewed S.P. after she was admitted.

During direct examination, Dr. Ahart was allowed to testify, over objection, as to S.P.'s responses to questions asked during the interview. S.P. indicated that her father had penetrated her vaginally, tried to penetrate her anally, and had put his penis in her mouth. S.P. also responded that no one else had touched her in these places and that she had not been sexually active.

In addition to an interview, Dr. Ahart conducted a complete physical and genital examination of S.P. While this examination revealed that S.P. no longer had a hymen, the doctor had no information about any injuries which might have accounted for its absence. Dr. Ahart testified that, on a virginal child, an adult speculum cannot be inserted into the vaginal area. With S.P., however, she was able to very easily insert and dilate such speculum, which meant the vaginal area had been stretched out.

Based on all the information she herself gathered from both the interview and the physical examination of S.P., along with all the input from the other specialists evaluating S.P.'s case, Dr. Ahart formed the opinion that S.P. had been sexually abused.

The defendant, testifying in his own behalf, denied his daughter's allegations. He attempted to establish that S.P.'s running away and her accusations against him were prompted by resentment directed at the control he and Mrs. Park exercised over her social conduct, especially as it related to her boyfriend, John Payne. During cross-examination of S.P., defense counsel had brought out that Dr. and Mrs. Park were strict disciplinarians who wanted to approve the young men their daughters dated. S.P. admitted she broke her parents' rules from time to time and that she was punished, by either her mother or her father, for doing so. She testified that she would be grounded almost all of the time and, if her parents were angry enough, they would punish her physically as well. S.P. remembered being asked during an interview at Mt. Sinai hospital how she got along with her mom and dad. She had responded that she had done a lot of things to make them angry and that they were not very happy at the moment. Finally, S.P. testified that she was afraid for the friends who helped her when she ran away because her parents threatened to have them sent to jail. In other tes-

timony, counsel explored the allegation that S.P. had said she wanted to run off to New York and become a dancer. During his direct examination, defendant indicated that S.P. might have lied about him in an attempt to protect John Payne.

As noted above, the jury acquitted defendant of the charges set forth in the first three counts of the indictment but found him guilty on count IV. After he was sentenced, defendant timely filed this appeal. After thoroughly and carefully examining the record, we are of the opinion that significant errors were made in the proceedings below, by both trial counsel and the trial court. Cumulatively, those errors were sufficient to require a new trial.

Defendant contends that he received ineffective assistance of counsel in that trial counsel (1) failed to tender or request limiting instructions with regard to evidence of offenses other than those charged, (2) elicited testimony from other witnesses which improperly corroborated S.P.'s story, and (3) failed to voice a proper objection to S.P.'s letter to her father. Defendant concludes that, as a result of counsel's errors, he did not receive a fair trial.

To establish ineffective assistance of counsel the defendant must show that counsel's performance was defective in that it fell short of an objective standard of reasonableness and that such performance prejudiced the defense to the extent that defendant was deprived of a fair trial. (*People v. Caballero* (1992), 152 Ill. 2d 347, 349, citing *Strickland v. Washington* (1984), 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064; *People v. Odle* (1992), 151 Ill. 2d 168, 172.) To establish the requisite prejudice defendant must show that, except for counsel's errors, there is a reasonable probability his trial would have had a different result. (*People v. Jackson* (1992), 149 Ill. 2d 540, 553.) These principles guide our review of trial counsel's effectiveness.

We address first defendant's claim that trial counsel failed to deal properly with evidence of other offenses. Defendant was convicted only on count IV. That count charged that defendant assaulted S.P. "on or about between July, 1989 and October, 1990" in that he penetrated her vaginally. At trial the State introduced evidence of an ongoing course of sexual abuse by defendant, starting well before 1989 and taking place in both Cook and Lake Counties. S.P. testified that the situation with her father began in the form of fondling when she was 10 years old, that he initiated oral sex with her in 1988, and that he had demanded oral sex in return for granting her various privileges. After stating that she and defendant had sex "possibly four" times while the family lived in Hawthorne

Woods, S.P. related three specific instances when defendant had sexual intercourse with her, one of which took place in Cook County. At no time did defense counsel request or tender an instruction to the jury as to the use of evidence of other offenses. Defendant asserts that the jury, therefore, might have based its decision on evidence of other offenses rather than evidence of the crime charged.

Evidence of other offenses is not admissible to establish a defendant's propensity to commit the offense charged. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 137; *People v. Cregar* (1988), 172 Ill. App. 3d 807, 821.) On the other hand, as defendant acknowledges, when sex crimes are involved, prior acts between the same parties are generally admissible to show the relationship and familiarity between the parties and to corroborate the complaining witness' testimony as to the act relied upon for conviction. (See *People v. Morgan* (1987), 152 Ill. App. 3d 97, 103; *People v. Bradley* (1984), 128 Ill. App. 3d 372, 381.) In this case, however, the jury was never apprised that these were the only purposes for which it could use the other crimes evidence.

The jury heard evidence of a variety of offenses by defendant, beginning years before the time of the crime charged. Due to the extensive time span alleged in count IV, and the general nature of much of the testimony, the jury was not even presented with a clear-cut basis for differentiating between evidence of the crime charged in count IV and evidence of other offenses. Also, while some of the other offenses occurred in Lake County, which is where the charged crime occurred, others took place in Cook County. Without an instruction as to the purposes for and limitation on the use of evidence of other crimes, the potential was created for great confusion on the part of the jury. In that confusion the jurors could have mistakenly focused on an offense other than what was alleged in count IV.

■ In a close case, as this one was, we think reasonable counsel would have recognized the vital importance of stressing to the jury that it was hearing evidence of other crimes and of making sure the jury was aware of the limited purposes for that evidence. It follows that counsel should have asked the court to give a limiting instruction at the time the evidence was admitted or, at the very least, should have tendered an appropriate instruction at the close of all the evidence. Absent such an instruction, the evidence of other offenses may have been given far greater weight than it deserved, all of it supporting S.P., and thus may have unfairly

tipped the scale in S.P.'s favor. Counsel's failure to seek a limiting instruction was a critical mistake.

Counsel erred also in eliciting testimony which reinforced S.P.'s claim that her father had sexually abused her. On cross-examination Rachelle Ko testified that she told her mother S.P. was coming to stay at their house because she had been raped by her father. Under further questioning, Ko added that S.P. told her as far back as the spring of 1990 that her father had raped her. Also on cross-examination, Officer Graham said that he based his conclusion that S.P. was in need of medical attention on the fact that S.P. told him she had been sexually molested by her father. Defendant asserts that, by inviting this testimony, counsel essentially provided corroboration of S.P.'s story. He urges that the jury may have been unfairly swayed by hearing S.P.'s version of events repeated over and over again. The State responds that the jury knew this was S.P.'s claim with or without the testimony of Ko and Graham. Further, according to the State, the statements were made in the context of counsel's attempt to discredit Ko's motives and the reasonableness of Graham's belief in S.P.'s statements.

■ We have examined the testimony of both Ko and Graham. While it may be true that the jury ultimately heard S.P.'s claim from S.P. herself, we do not think this fact rendered the other witnesses' testimony harmless. On the contrary, as we will discuss further in a moment, the evidence here was closely balanced. While there was some corroboration of S.P.'s version, even that evidence was not without flaws. Nevertheless, the jury first heard both Ko and Graham say that S.P. told them defendant had sexually molested her and then heard S.P. herself repeat the exact same story. We agree with defendant that where there is no evidence against defendant except that found in the accusation of the victim, there is a danger that the jury's verdict was the result of hearing the victim's version more than once. (*People v. Salas* (1985), 138 Ill. App. 3d 48, 54-55; *People v. Andino* (1981), 99 Ill. App. 3d 952, 957; *People v. Jacobs* (1977), 51 Ill. App. 3d 455, 459.) In this case defense counsel's actions created that danger.

The State's argument that counsel was merely trying to discredit the witnesses is not persuasive. In light of the essentially balanced evidence, it was essential to avoid or prevent the introduction of any evidence that even appeared to corroborate S.P.'s story. The State does not demonstrate that it was necessary to elicit testimony regarding the identity of the alleged perpetrator in order to discredit the testimony of either Ko or Officer Graham. The risk cre-

ated by counsel far outweighed any benefit to be gained from inviting the challenged testimony.

Defendant also claims that counsel should have objected to the admission of the letter S.P. wrote to her father. We note that counsel did object on the ground that the letter was a copy and not the original writing. He also objected to publication of the letter by having S.P. read it into the record. However, defendant insists that counsel should have objected to *any* admission of the letter on grounds that it was self-serving. Defendant argues that the letter was improperly offered to bolster S.P.'s testimony by showing that on a prior occasion the witness made a consistent statement about the matter in issue.

■ Evidence of statements made by a witness prior to trial is inadmissible for the purpose of corroborating that witness' testimony at trial. (*People v. Hayes* (1990), 139 Ill. 2d 89, 138; *People v. Shum* (1987), 117 Ill. 2d 317, 340.) However, prior consistent statements are admissible to rebut a charge or inference that the witness is motivated to testify falsely or has recently fabricated her in-court testimony. (*Hayes*, 139 Ill. 2d at 138; *Shum*, 117 Ill. 2d at 340-41.) This exception does not apply here. S.P.'s letter was not offered in an effort to rehabilitate S.P. as a witness. On the contrary, it was identified, offered, admitted, and published to the jury during direct examination of the State's witnesses. As we see it, counsel failed to make the fundamental objection that the letter was offered only to corroborate S.P.'s testimony and, therefore, was inadmissible. As a result, the jury was exposed to still another repetition of S.P.'s own story, thus increasing the danger that the jury's verdict resulted from hearing the victim's version over and over again. Counsel's failure to object added to the weight of the prejudice against defendant in this trial.

■ This was an extremely close case. We note first of all that the jury acquitted defendant of counts I, II, and III, counts which encompassed charges and a time frame similar to those found in count IV. With regard to count IV, S.P. accused defendant of sexually abusing her. Defendant denied that he ever had sexual contact with his daughter. Although the evidence left little doubt that S.P. had engaged in sexual relations, the evidence supporting S.P.'s claim that she had been sexually abused was far less reliable. It is true that Dr. Ahart testified to sexual abuse, but the doctor's conclusion rested in large part on what she had been told by S.P. herself. In addition, there was no effective corroboration of S.P.'s testimony that her father was the one who abused her. Finally,

defendant had introduced evidence that S.P.'s accusations sprang from resentment toward her parents' control and discipline. In the final analysis, the evidence boiled down to a matter of the complaining witness' word against the word of the defendant. Hence, it was imperative that the jury be presented only with proper evidence and that it be aware of how to use that evidence. As a result of counsel's errors the jury may have focused on conduct of defendant which was not even the subject of the charge against him. And/or the jury may have perceived the needless and improper repetition of S.P.'s story as valid and significant corroboration of her own testimony. Under either or both of these scenarios, in a case as close as this one, the shift in the weight of the evidence would be not merely prejudicial, but devastating to defendant. We conclude that there is a reasonable probability in this case that, but for counsel's errors, defendant's trial would have had a different result. Defendant, therefore, was deprived of a fair trial. *People v. Jackson* (1992), 149 Ill. 2d 540, 553.

■ The errors just discussed were not the only ones made in the proceedings below. The trial court also made a telling error which contributes to the grounds for reversal of this case. Specifically, the trial court should not have admitted the letter S.P. wrote to her father. Although defendant failed to object to the actual admission of the letter and, thus, has not preserved the error for review (*People v. Enoch* (1988), 122 Ill. 2d 176, 186), in a case like this, where the evidence is so closely balanced, the issue may be reviewed as a matter of plain error. (134 Ill. 2d R. 615(a); *People v. Psichalinos* (1992), 229 Ill. App. 3d 1058, 1065.) We have already determined that the letter was self-serving, cumulative of S.P.'s testimony, and inadmissible as a prior consistent statement. The court nevertheless admitted it despite the prejudice to defendant from the repetition of S.P.'s story. The error was heightened when the court allowed the State to publish the letter to the jury over defendant's objection, particularly since the 14-year-old complaining witness herself read the letter into the record. Once again, the error was significantly prejudicial to defendant.

The State posits that S.P.'s letter was admissible under an exception which allows reports relevant to a police investigation where that investigation forms an integral part of the narrative of the arrest. (See *People v. Johnson* (1982), 104 Ill. App. 3d 572.) In *Johnson,* a police officer testified that he stopped defendant, in part, on the basis of a radio report of another crime. That information was essential to the jury's understanding of why the defendant

was stopped. The letter itself in this case was not essential to show how the police investigation of defendant began since the record contains an abundance of testimony about the letter.

Both S.P. and Rachelle Ko testified as to how the letter came about. S.P. said she had not left the letter at her home because she did not want her mother to find it. Referring to the postscript to the letter warning the defendant he "better leave [S.] alone," defense counsel specifically asked S.P. if S. had told her that defendant was molesting her. Rachelle Ko explained how she photocopied the original letter, then called the police officer and gave him the photocopy, figuring the police could use the letter as evidence. Finally, Detective Graham of the Hawthorne Woods police department testified that reading the letter and the missing person report on S.P. prompted him to go to S.P.'s high school and talk to her. In our view, the cumulative testimony about the letter was sufficient for the jury to understand why the police began an investigation. The prejudicial effect of the letter itself outweighed any need for its admission into evidence, and even more particularly any need for its publication to the jury on this issue.

The record of this case reveals that errors were made by both the trial court and defense counsel. Due to the closely balanced nature of the evidence, none of these mistakes can be characterized as harmless. While we do not determine whether any single flaw, by itself, would require reversal, we are convinced that, collectively, the errors were sufficient to deprive defendant of a fair trial.

■■ We will briefly address an additional issue raised by defendant since it may come up again on retrial. Over counsel's objection the court admitted Dr. Ahart's testimony regarding S.P.'s statements that her father had sexually molested her. Defendant characterizes the doctor's revelations as inadmissible hearsay which improperly corroborated S.P.'s own testimony, similar to the disclosures elicited from Rachelle Ko and Officer Graham. We find that the doctor's testimony was admissible.

Statements by victims of sex offenses to medical personnel for purposes of diagnosis or treatment are admissible as an exception to the hearsay rule. (Ill. Rev. Stat. 1989, ch. 38, par. 115—13; *People v. White* (1990), 198 Ill. App. 3d 641, 654-56; *People v. Roy* (1990), 201 Ill. App. 3d 166, 177-78.) The statute provides that such statements may include the following: "descriptions of the cause of symptom, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." (Ill. Rev. Stat. 1989, ch. 38, par.

115—13.) The statements challenged by defendant were made during an interview with S.P. Dr. Ahart specifically testified that she interviewed S.P. in order to determine a treatment program. The doctor had explained that S.P. was admitted to a program in which she would be evaluated by teams consisting of doctors, child development specialists, child psychologists, social workers, nurses, and child care workers. A diagnosis would be made only after all the teams completed their assessments. In the context of this comprehensive approach to evaluation, the statement of a 14-year-old girl that her father had abused her was most certainly reasonably pertinent to diagnosis and treatment. Considering all the circumstances of this case, the statements were admissible under the statutory hearsay exception.

For all of the foregoing reasons, defendant's conviction is reversed, and this matter is remanded for a new trial.

Reversed and remanded.

McLAREN and GEIGER, JJ., concur.