2020 IL App (2d) 190666-U
No. 2-19-0666
Order filed August 4, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 12-CF-664 |
| C.A. BARNETT, | ) ) ) | Honorable Robbin J. Stuckert, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRIDGES delivered the judgment of the court.
Justices McLaren and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in granting the State's motion to dismiss defendant's second-stage postconviction petition. Therefore, we affirm.

¶ 2    Following a jury trial, defendant, C.A. Barnett, was found guilty of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 1998)) and sentenced to 12 years' imprisonment. We affirmed his conviction on appeal. *People v. Barnett*, 2018 IL App (2d) 170248-U. He thereafter filed a petition under the Post-Conviction Hearing Act (Postconviction Act) (725 ILCS 5/122-1 *et seq.* (West 2018)), arguing that his trial counsel was ineffective for failing to impeach the accuser and introduce certain evidence at trial. Defendant's petition advanced to

second-stage proceedings, whereupon the trial court granted the State's motion to dismiss the petition. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                              A. Trial and Prior Appeal

¶ 5      On January 11, 2013, a grand jury indicted defendant on two counts of predatory criminal sexual assault of a child. Count I, as amended, alleged that between January 1, 1999, and December 31, 2003, defendant committed an act of sexual penetration with a minor, K.F., in that he placed his fingers in her sex organ. Count II alleged abuse of another minor, M.F. Defendant successfully sought to sever the two counts, and the State elected to proceed with count I. After the trial and before sentencing, the State nolle prossed count II.

¶ 6       We provided a detailed recitation of the evidence adduced at trial in the prior appeal (see *Barnett*, 2018 IL App (2d) 170248-U), so we provide only a brief summary here. K.F., defendant's step-granddaughter, testified that defendant sexually assaulted her at least 20 times when she was between three and seven years old, between 1999 and 2003. K.F. testified that the assaults took place at defendant's home, where K.F.'s father, David, lived for a time and where K.F. would regularly spend the night.

¶ 7      Defendant was convicted, and on appeal, he argued that trial court abused its discretion in admitting other-crimes evidence (abuse of M.F.) to show his propensity to commit the charged crime, and that there was insufficient evidence to prove him guilty beyond a reasonable doubt. This court affirmed. *Id.*

¶ 8                              B. Postconviction Petition

¶ 9      Subsequently, on September 27, 2018, defendant filed a postconviction petition through counsel. The trial court advanced the petition to the second stage of proceedings on November 28,

- 2 -

2018. Defendant filed an amended petition on January 23, 2019, which is at issue in this appeal. He alleged that his trial counsel was ineffective for failing to impeach K.F. on critical points and for failing to offer certain exculpatory evidence that was in his possession. First, defendant alleged that counsel failed to present evidence that defendant worked Friday afternoons into Saturday mornings, which would have contradicted K.F.'s testimony that he often picked her up on Friday nights and brought her back to his residence, where he then abused her. He attached an affidavit that he authored stating that from December 2000 to May 2002, he worked the second shift at Greenlee Textron Mondays through Fridays, from about 2 or 3 p.m. to 2 or 3 a.m., or sometimes as late as 5 a.m. Defendant further averred that from June 2002 to August 2003, he worked as an over-the-road truck driver for Nestle and would be gone for one or two weeks at a time, and he was not home most Fridays through Sundays. He averred that in August 2003, he went back to work at Greenlee Textron, resuming his prior schedule. Defendant attached affidavits corroborating his Greenlee Textron schedule; the affidavits were from Sheila Barnett, who was his wife and K.F.'s grandmother; Harold Ledford, his supervisor "from approximately 2001 to 2009"; and Cheryl Ledford, Harold's wife and defendant's co-worker.

¶ 10    Second, defendant alleged that counsel failed to present photographs taken after 2003 of K.F. in her soccer uniform, which would have contradicted K.F.'s testimony that she quit playing soccer that year because she wanted to avoid spending the night at defendant's residence. He attached photographs that had handwriting on the back indicating that one was taken in fall 2004 and the other was taken in fall 2006. Sheila averred that K.F.'s step-mother had written the dates on the photographs, and that Sheila had received them at a corresponding time. A third photograph was not dated. Sheila averred that she believed that the third photograph was from either fall 2005 or fall 2007, and that she had received it around the time it was taken.

¶ 11 Third, defendant alleged that counsel did not confront K.F. with a prior false statement made to a DCFS worker wherein K.F. said that she would lock the bedroom door at defendant's residence to prevent defendant from entering the room and abusing her. Defendant alleged that counsel possessed photographs, which defendant attached, showing that the door's lock was inoperable. Sheila averred that the lock to the bedroom door where K.F. slept was inoperable from the time Sheila moved into the house because the keyhole was painted over. She averred that none of the doors in the house could be locked.

¶ 12 Fourth, defendant alleged that counsel failed to call Zach Botts, his step-grandson and K.F.'s cousin, as a witness. He alleged that between 1998 and 2001, Botts would regularly visit defendant's residence on Saturday mornings when K.F. was visiting her father. Defendant alleged that Botts would have testified that he observed that K.F. slept in the same bedroom as David, which would have contradicted K.F.'s claim that David slept down the hall and that she slept in a different bedroom where defendant would abuse her. Defendant attached an affidavit from Botts.

¶ 13 Last, defendant alleged that counsel did not present testimony from other family members who would have countered K.F.'s testimony that she did not want to be around defendant. Defendant attached affidavits from his son and grandson stating that they had observed many interactions between K.F. and defendant. They averred that defendant and K.F. appeared to have a positive, normal grandfather-granddaughter relationship, and that K.F. never appeared fearful of defendant.

¶ 14                                  C. Trial Court's Ruling

¶ 15 The State moved to dismiss the petition, arguing that defendant had failed to make a substantial showing of a constitutional violation.

¶ 16     The trial court granted the motion to dismiss on June 27, 2019, reasoning as follows. Regarding the impact of evidence of defendant's work history, K.F. testified that her parents divorced when she was two or three years old, and that she then lived with her mother in Genoa. Between 1999 and 2003, she would have been ages three to seven. She had visitation with David every other weekend, and during those visits she would stay at defendant's and Sheila's house on Friday nights. While she was there, defendant perpetrated the abuse in the basement, living room, and David's old bedroom, where K.F. would sleep. K.F. hated going to the house if she knew that defendant was going to be there, and she would kick and scream and not want to go. However, she did not mind being there if defendant had to work. David was living at the house for a time, but she would still stay there after he moved out so that he would not have to drive back and forth between Malta and Genoa, Illinois, to be able to take her to her Saturday morning soccer games.

¶ 17     The trial court stated that it was clear from the testimony at trial that there were times that defendant was not at the house because he had to work. The precise times that defendant sexually assaulted K.F. when she slept at his house were unknown, such that he could have done so in the early morning hours when he returned from work. Further, defendant's affidavit did not claim that he was never home on Friday nights into Saturday mornings. Also, defendant testified at trial that he worked the night shift from 2000 until at least 2010 and therefore was not home after 2:30 or 3:30 a.m. on Friday nights/Saturday mornings, such that the additional evidence would have little probative value.[1]

---

[1] At trial, defendant testified generally that he worked nights as a machinist at the time David was living at the house, and that K.F. stopped staying overnight after David moved out in 2001. Harold Ledford testified that he was defendant's supervisor from 2000 to 2010 and that

¶ 18     Regarding the photographs, the trial court stated that the State was not required to prove that the crime occurred on a particular date, though dates could be relevant in calling a complainant's basic credibility into doubt. The record showed that trial counsel engaged in vigorous cross-examination to challenge K.F.'s ability to recall specific dates, but she remained consistent in her testimony that the abuse occurred between 1999 and 2003. The photographs would have established only that the abuse could have occurred further in time.

¶ 19     As for the doors, K.F. had told a DCFS interviewer that she locked the door, whereas defendant provided affidavits stating that the door did not lock. However, counsel's failure to raise this issue would not rise to level of failing to conduct any meaningful adversarial testing, and he did attack K.F.'s veracity through highlighting inconsistencies and discrepancies in her testimony.

¶ 20     Botts's affidavit would not have made a significant difference because the record reflected vigorous cross-examination about sleeping arrangements, with both David and Sheila contradicting K.F.'s testimony on this subject.

¶ 21     Defendant further claimed that trial counsel was ineffective for failing to call Christian Barnett, Michael Barnett, and Botts to testify that K.F. and defendant had a normal relationship, to counter K.F.'s testimony that she had a poor relationship with him and hated going to his house. K.F.'s relationship with her grandfather was addressed through cross-examination. Although defendant argued that Botts was a neutral witness, Botts had a familial relationship with defendant. Also, counsel called other witnesses to testify regarding defendant's character. Based on the

---

defendant worked the second shift, which was from "3:30 to 11:30 or if we was [*sic*] working overtime anywhere between 2:30 and 3:30 a.m." Cheryl Ledford testified that she worked the night shift with defendant.

record, the zealous cross-examination of State witnesses, and the testimony of defendant and Sheila, trial counsel's decision about whether to call certain witnesses was trial strategy, and his strategy was not so unsound that no meaningful adversarial testing was conducted.

¶ 22    The trial court concluded that defendant's claim of ineffective assistance of counsel was without merit, and that he had therefore failed to make a substantial showing of a constitutional violation. The trial court therefore granted the State's motion to dismiss defendant's petition.

¶ 23    Defendant moved to reconsider the dismissal on July 16, 2019, and the trial court denied his motion on July 23, 2019. Defendant timely appealed.

¶ 24                                II. ANALYSIS

¶ 25    The Postconviction Act provides a means for individuals serving criminal sentences to assert that their convictions resulted from substantial denials of their constitutional rights. *People v. Johnson*, 2017 IL 120310, ¶ 14. It creates a three-stage process for adjudicating postconviction petitions. *Id*. During the first stage, the trial court independently determines, without input from the State, whether the petition is "frivolous or is patently without merit." 725 ILCS 5/122-2.1 (West 2018). If the trial court determines that the petition is not frivolous or patently without merit, the petition advances to second-stage proceedings. *People v. Lesley*, 2018 IL 122100, ¶ 31. At this stage, the State may either answer the petition or move to dismiss the petition. 725 ILCS 5/122-5 (West 2018); *People v. Dupree*, 2018 IL 122307, ¶ 29. To survive dismissal, the petition must make a "substantial showing" of a deprivation of constitutional rights. *Id.* ¶ 28. The trial court examines the petition to determine its legal sufficiency, and it must accept as true any allegations not affirmatively rebutted by the record. *Id.* ¶ 29. Where, as in this case, the trial court dismisses a postconviction petition at the second stage, we review its ruling *de novo*. *Id.*

¶ 26    Defendant's postconviction petition alleged that his trial counsel rendered ineffective assistance of counsel. For such a claim, a defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Hodges*, 234 Ill. 2d 1, 17 (2009). The defendant must first establish that, despite the strong presumption that trial counsel acted competently and that the challenged action was the product of sound trial strategy, counsel's representation fell below an objective standard of reasonableness under prevailing professional norms such that he or she was not functioning as the counsel guaranteed by the sixth amendment. *People v. Manning*, 227 Ill. 2d 403, 416 (2008). Second, the defendant must establish prejudice. *People v. Valdez*, 2016 IL 119860, ¶ 14. In most situations this is done by showing a reasonable probability that the proceeding would have resulted differently absent counsel's errors. *Id*. A failure to establish either prong of the *Strickland* test precludes a finding of ineffectiveness. *People v. Peterson*, 2017 IL 120331, ¶ 79. At the second stage of postconviction proceedings, a defendant must make a substantial showing that counsel's performance was deficient and a substantial showing that the defendant was prejudiced. *People v. Johnson*, 2019 IL App (1st) 162999, ¶ 55.

¶ 27    On appeal, defendant argues that the trial court failed to recognize the impeaching nature of the evidence at issue, the significance of the impeachment, and the damage done to his case by not having his defense corroborated by additional evidence. Defendant further argues that the trial court wrongly dismissed the value of some of the most important pieces of evidence because it found that it would not have established that defendant could not have committed the crime, in effect incorrectly requiring him to prove actual innocence. Defendant argues that the trial court also did not consider the cumulative effect of counsel's errors.

¶ 28    Defendant argues that the State did not present any scientific evidence, occurrence witnesses, or a confession in this case, such that the jury was presented with two different versions

of events and left to decide the case based on witness credibility. He cites many cases to support the proposition that where the jury's verdict hinges on credibility determinations, the availability of impeaching information is very important. See, *e.g.*, *People v. Garza*, 180 Ill. App. 3d 263, 269 (1989) (jury was not told about all of the inconsistencies in the eyewitness's story, and there was a reasonable probability that the omissions influenced the proceeding's outcome). Defendant argues that here counsel possessed or knew of evidence that would have undercut K.F.'s testimony on crucial facts that went to the heart of her allegations, in that they accounted for the primary circumstances in which K.F. testified that she was sexually abused.

¶ 29   In particular, defendant argues that Botts's affidavit established that K.F. slept in the same bedroom as David, as both defendant and Sheila testified during the trial. Defendant argues that, in contrast, K.F. testified that she slept in a different bedroom down the hall, which had no door and only a daybed. Defendant argues that the State called David as a witness to corroborate her testimony. Defendant maintains that Botts's testimony would have corroborated his and Sheila's testimony and fatally undermined one of the most important parts of K.F.'s testimony, being her claim that she was abused during the night while her father slept down the hall. Defendant asserts that Botts would have been a neutral witness because he is related by blood to K.F. but not to defendant, who was his step-grandfather.

¶ 30   We agree with the trial court that Botts's testimony regarding sleeping arrangements does not constitute a substantial showing of ineffective assistance of counsel. Significantly, the first time K.F. was asked where she would sleep at defendant's house, she testified: "In my dad's old bedroom. If you walk up the stairs, it was to the right." She testified that she always slept there alone. On cross-examination, when asked the same question, she testified: "There's three bedrooms upstairs. When you walk up to the right, there's my dad's old room. To the left is my

old room and then down the hall is Sheila and [defendant's] old room." Given that K.F. herself provided conflicting testimony about which room she slept in, defendant failed to make a substantial showing that Botts's testimony on this subject created a reasonable probability that the trial would have resulted differently. This is also true of Botts's statement that K.F. slept with David, as Botts averred that he would come over on Saturday mornings, as opposed to being there on Friday nights. There was also already conflicting testimony on this subject. Further, defendant, Sheila, and David all testified that David moved out of defendant's house in May or June 2001, whereas the alleged abuse occurred until 2003. Finally, K.F. testified that defendant abused her in the living room and in the basement in addition to the bedroom.

¶ 31 Defendant next argues that his work schedule undercut K.F.'s claim that he, along with Sheila, would pick her up on Friday nights between 2001 and 2003, after David moved out of the house. Defendant argues that they denied doing so, but K.F.'s mother corroborated K.F.'s account. Defendant asserts that the trial court incorrectly found that the evidence about his work schedule would have been cumulative, because "[t]here was no information concerning the days he worked or his actual work hours." Defendant argues that the jury never heard that he worked Friday afternoons into Saturday mornings or that he was an over-the-road truck driver from May 2002 to August 2003 and "was therefore rarely home on Friday nights." Defendant maintains that the trial court's additional statement, that his work schedule did not establish that he could not have sexually assaulted K.F. when he returned home from work, ignores the purpose of the evidence, which was not to prove actual innocence but rather to show ineffective assistance of counsel for failing to impeach K.F. and corroborate his denial.

¶ 32 Contrary to defendant's argument that there was no testimony at trial regarding defendant's work schedule, Harold Ledford testified at trial that he was defendant's supervisor from 2000 to

2010 and that defendant worked the second shift, which was from "3:30 to 11:30 or if we was [*sic*] working overtime anywhere between 2:30 and 3:30 a.m." Defendant testified that he worked nights and would not have had occasion to go into K.F.'s room when she was sleeping. Cheryl Ledford testified that she worked the night shift with defendant. Accordingly, the additional evidence that defendant submitted regarding his work schedule was largely cumulative. Exactly who picked up K.F. and brought her to defendant's house was not directly relevant, as it is undisputed that K.F. spent nights there, and the abuse was not alleged to have taken place during the drive. Further, as the trial court pointed out, defendant did not aver that he was never home when K.F. slept there, as further reflected in his argument that he was "rarely" home on Friday nights, and defendant could also have abused her after his shift ended. We again note that K.F. testified that the abuse additionally occurred in the living room and basement. These observations are not an improper attempt to have defendant prove actual innocence, but rather are part of a prejudice analysis, which leads to the conclusion that defendant failed to make a substantial showing that there was a reasonable probability that the trial would have resulted differently had this evidence been presented.

¶ 33   Defendant also argues that the soccer photographs were significant because K.F. testified that the abuse ended when she quit soccer in 2003, which she did solely to avoid staying at defendant's house. Defendant highlights that in closing argument, the prosecution argued that children remember occurrences not based on dates but rather based on what other things were happening at the same time, such as playing soccer, which made K.F.'s testimony more credible. Defendant argues that the photographs unequivocally established that K.F. played soccer until at least 2006, which directly contradicted her trial testimony. Defendant argues that the trial court reached an unreasonable conclusion in stating that the photographs may have caused the jury to

conclude that the abuse occurred beyond 2003, because no party alleged or argued such thing, and K.F. was adamant that the abuse ended in 2003.

¶ 34    K.F. testified that she initially told a DCFS worker that the abuse occurred between the ages of three and five, but that the abuse actually occurred between the ages of three and seven. K.F. testified:

> "[I]t's kind of hard to remember dates when you're young and the more I thought about it it happened till the day that I stopped soccer. That was the reason I stopped soccer. I loved it, but I had to stop because I couldn't put myself in that situation every other weekend. So I have all my soccer trophies—I used to, at least—and going back it happened up till I was seven and I have—I used to have the trophies to prove it because to me it only happened any time I spent the night there and I stopped spending the night there when I was seven because I stopped soccer."

We agree with the trial court that it was reasonable for trial counsel to choose not to introduce the photographs. Whether or not K.F. continued to play soccer after 2003 did not directly affect her credibility regarding the acts that she alleged defendant committed against her. The photographs could have actually harmed defendant's case by suggesting that the abuse took place beyond 2003. That is, K.F. testified that she realized that the abuse stopped when she stopped playing soccer, which she testified occurred in 2003. If confronted with evidence that she played soccer until 2006, she could have logically testified that the abuse must have therefore occurred until 2006. Moreover, the State was not required to prove that the predatory criminal sexual assault was committed on a particular date, as the date was not an essential element of the offense.  See *People v. Letcher*, 386 Ill. App. 3d 327, 331 (2008); see also *People v. Bishop*, 218 Ill. 2d 232, 247 (2006) ("[I]t is often difficult in the prosecution of child sexual abuse cases to pin down the times, dates,

and places of sexual assaults, particularly when the defendant has engaged in a number of acts over a prolonged period of time.").

¶ 35    Defendant similarly argues that trial counsel failed to confront K.F. about a prior false statement to DCFS, wherein she testified that she would lock her bedroom door at defendant's residence to prevent the abuse. Defendant argues that trial counsel possessed photographs showing that the door to the lock was inoperable, and that Sheila was prepared to testify that none of the interior doors in the house locked.

¶ 36    The evidence regarding the locks would not amount to a substantial showing of ineffective assistance of counsel. The statement that K.F. made to the DCFS interviewer is not as clear as defendant describes. The interview notes state: "When she was seven dad moved to Dixon and she was not at grandpa's much and she would lock her door." In other words, it is not clear what door she was referring to. Further, the abuse took place when K.F. was very young, ending about nine years before the interview, which would decrease the impact of this type of collateral detail. Also, defendant and Sheila both testified at trial that K.F. always slept with David when she stayed over on Friday nights, and that she ceased sleeping over once he moved out. Accordingly, evidence regarding the locks was not important to the defense's theory of the case. We also again reiterate that the alleged abuse was not limited to a bedroom.

¶ 37    Last, defendant argues that family members Christian and Michael Barnett and Botts were willing to testify that they observed K.F. interacting normally with defendant at gatherings during the period of time covering the allegations. Defendant argues that this would have contrasted with K.F.'s testimony that she hated spending time with him. Defendant argues that the trial court concluded that this decision amounted to trial strategy, but it failed to discuss the impeaching value

of the evidence. Defendant asserts that his claim of ineffective assistance is even stronger when one considers the cumulative effect of counsel's errors.

¶ 38    Defendant's argument is without merit. Trial counsel's decisions of what witnesses to call are matters of trial strategy that are generally immune from claims of ineffective assistance of counsel, unless counsel fails to engage in any meaningful adversarial testing. *People v. Custer*, 2019 IL 123339, ¶ 39. In particular, it can be risky to call relatives as witnesses to challenge the credibility of a family member alleging sexual abuse because it can appear that the family was unconcerned with the abuse or attacking the victim, thus bolstering the victim's credulity or giving the jury reason to sympathize with the victim. See *People v. Cooper*, 2013 IL App (1st) 113030, ¶ 78. This evidence would also have been cumulative, in that the defense introduced numerous photographs at trial of K.F. with defendant and at his house during the time period in question, and she appeared to be enjoying herself, as opposed to looking fearful or wary.

¶ 39    As we have found no merit in defendant's individual claims of error, we likewise find no cumulative error. See *People v. Sims*, 2019 IL App (3d) 170417, ¶ 55 (generally, there is no cumulative error where each of the alleged individual errors do not amount to reversible error).

¶ 40    Citing a list of cases, defendant argues that Illinois courts have repeatedly held that defense counsel's failure to impeach a witness when significant impeachment is available cannot be said to be trial strategy and may support an ineffective assistance claim. See *People v. Williams*, 329 Ill. App. 3d 846, 855-56 (2002) (counsel did not impeach robbery victims with the prior statements to police, or call police officers to testify about the statements); *People v. Vera*, 277 Ill. App. 3d 130, 139-40 (1995) (counsel did not impeach eyewitness who identified defendant as the shooter at trial with the witness's prior inability to identify the shooter in photographs); *People v. Salgado*, 263 Ill. App. 3d 238, 246-47 (1994) (counsel failed to impeach eyewitness with contradictory

testimony from prior trial); *People v. Skinner*, 220 Ill. App. 3d 479, 484-85 (1991) (counsel did not impeach the witness on his failure to identify the defendant until six months after the crime); *Garza*, 180 Ill. App. 3d at 267-70 (counsel did not impeach sole eyewitness with her inconsistent descriptions of her attacker). Defendant argues that here trial counsel similarly ignored crucial pieces of evidence that impeached K.F. on important points and corroborated the defense. Defendant maintains that counsel likewise failed to interview Botts even though the Barnetts told counsel that he may have favorable information.

¶ 41    Defendant argues that this case is most similar to *People v. Park*, 245 Ill. App. 3d 994 (1993). There, the trial court reversed the defendant's conviction for sexual abuse to his daughter and remanded for a new trial based on various errors by trial counsel. *Id.* at 1006. The errors included failing to object to a prior consistent statement of the daughter, failing to offer a limiting instruction for other crimes evidence, and eliciting testimony on cross-examination that corroborated the allegations. *Id.* at 1002-04. The appellate court stated that the evidence was closely balanced and that the errors collectively deprived the defendant of a fair trial. *Id.* at 1006. Defendant argues that his case is similar to *Park* because it was a credibility battle between him and K.F., and K.F. had a motive to lie as shown by the fact that she did not come forward with her allegations until learning that her younger sister, M.F., said that defendant had inappropriately touched her. Defendant argues that the impeachment was particularly important because K.F. "had already been impeached on important points." Defendant argues that counsel had an abundance of impeaching evidence but failed to use it, which amounted to ineffective assistance of counsel.

¶ 42    We have already discussed the evidence that defendant raised in his postconviction petition and determined that its absence from trial did not constitute ineffective assistance of counsel. This case is readily distinguishable from the list of cases cited by defendant because in

those cases, the attorneys failed to impeach central witnesses to the crimes who had identified the defendants as the perpetrators. Here, in contrast, there was not a question of identification. It is distinguishable from *Park* because there the appellate court found significant individual errors that amounted to cumulative error. Further:

"[g]enerally, the decision whether or not to cross-examine or impeach a witness is a matter of trial strategy which will not support a claim of ineffective assistance of counsel. [Citation.] The manner in which to cross-examine a particular witness involves the exercise of professional judgment which is entitled to substantial deference from a reviewing court. Defendant can only prevail on an ineffectiveness claim by showing that counsel's approach to cross-examination was objectively unreasonable." *People v. Pecoraro*, 175 Ill. 2d 294, 326-27 (1997).

In this case, trial counsel cross-examined K.F. in detail, highlighting that: she came forward with her accusations only after learning about M.F.; K.F. initially denied to David and a DCFS worker that defendant abused her; and the ages she alleged that the abuse took place changed over time. Defendant himself recognizes that counsel "impeached [K.F.] on important points." Counsel also cross-examined the other State witnesses and brought in several witnesses to testify in support of defendant. Even if counsel could be said to have made errors in his trial strategy, "[e]rrors in trial strategy do not constitute ineffective assistance unless counsel entirely fails to conduct any meaningful adversarial testing" (internal citations omitted) (*People v. Custer*, 2019 IL 123339, ¶ 30)), which is not the situation here. For all of these reasons, defendant has failed to make a substantial showing that counsel's approach to cross-examination was objectively unreasonable or that counsel was otherwise ineffective for failing to introduce the evidence discussed in

defendant's postconviction petition, such that the trial court did not err in granting the State's motion to dismiss the petition.

¶ 43                                    III. CONCLUSION

¶ 44    For the reasons stated, we affirm the judgment of the De Kalb County circuit court.

¶ 45    Affirmed.