2021 IL App (2d) 200539-U
No. 2-20-0539
Order filed June 15, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CM-2345 |
| LINDSEY A. DELRAHIM, | ) ) ) | Honorable Charles D. Johnson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

¶ 1   *Held*:   At defendant's trial for domestic battery for punching and throwing coffee on the victim, there was no prejudice to defendant from defense counsel's alleged errors in (1) eliciting incriminating hearsay statements from a witness and (2) failing to advise defendant of her right not to testify, where the trial court found her testimony incredible. There was ample evidence of defendant's guilt apart from the hearsay testimony, and, if defendant had not testified, the victim's account would have gone unrebutted.

¶ 2   Defendant, Lindsey A. Delrahim, appeals her conviction, following a bench trial, of two counts of misdemeanor domestic battery (720 ILCS 5/12-3.2(a)(1), (a)(2) (West 2018)). She argues that she was denied the effective assistance of counsel when her trial counsel elicited

testimony that defendant claims was inadmissible and failed to advise her of right not to testify. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On September 4, 2019, defendant was charged by information with three counts of domestic battery, stemming from an incident with her husband, Michael Delrahim, that occurred on August 21, 2019. Count I alleged that defendant knowingly caused bodily harm to Michael by striking him about the body (see *id.* § 12-3.2(a)(1)). Count II alleged that defendant knowingly made contact of an insulting or provoking nature with Michael by striking him about the body (see *id.* § 12-3.2(a)(2)). Count III, which was nol-prossed before trial, alleged that defendant knowingly made contact of an insulting or provoking nature with A.D., (defendant and Michael's minor daughter), by striking her about the body (see *id.* § 12-3.2(a)(2)).

¶ 5      A bench trial took place on January 14, 2020, at which defendant was represented by private counsel. The State presented two witnesses. Michael testified that on August 21, 2019, he was married to defendant and they lived in Highland Park. Michael and defendant had two children—eight-year-old twins, A.D. and Z.D. Although Michael had filed a petition for dissolution of marriage in October 2018, he and defendant had agreed to live together during the pending dissolution. On the morning of the incident, defendant arrived home at about 7:20 a.m., after having "slept out" the previous two nights. Upon entering the home, defendant first spoke to A.D. and Z.D. Michael then told defendant that he had made a doctor appointment for Z.D., who had "developed a twitch in his eye," for that afternoon after school. Defendant became "upset and angry" because she had a Girl Scout event to attend with A.D. at the same time. Michael told defendant that he scheduled the appointment for after school because he did not want Z.D. to miss school. In front of the children, defendant screamed, " '[Y]our daddy is an asshole.' " Michael

- 2 -

went upstairs to help Gabrielle Idegard, "who live[d] in [their] house," fold Z.D.'s laundry. Defendant followed him upstairs. Defendant asked Michael why he scheduled Z.D.'s appointment at that time and Michael again explained his reasoning. Defendant screamed, " 'You are [*sic*] fucking asshole.' " Defendant went downstairs. About four minutes later, Michael went downstairs to get the children ready for school. Defendant was in the "mudroom" with A.D. helping A.D. get her things together, and Z.D. was already outside. As defendant was helping A.D., defendant told A.D. that "Mommy is going to be at your gymnastics tryouts." Michael then told defendant, " 'Her gymnastics tryouts are on September 9th at her first practice.' " Defendant responded with a "nasty tone," asking if Michael had registered A.D. for gymnastics. Michael told defendant that he had registered A.D., that he had paid, and that he had coordinated a carpool with a neighbor. When the prosecutor asked Michael how defendant responded, the following ensued:

"A. With a close [*sic*], raised fist she punched me in the head above my left temple, and with her right hand as she was holding a cup of coffee she threw it at me and the coffee hit me.

Q. You say she punched you with which hand?

A. She punched me with her right fist and threw her coffee with her left hand.

Q. Did the coffee hit you?

A. The coffee did hit me.

Q. Where did it hit you?

A. It hit me on my shirt, across my chest, it hit the window, the floor, the wall.

Q. Did it hit anyone else?

A. It hit [A.D.], my daughter. It was on her shirt, her shoes, her backpack, and her pants.

Michael testified that the coffee "wasn't cold. It felt hot." Michael testified that defendant then ran out the garage door. He testified:

> "[A.D] was screaming, crying. She was [*sic*] why did mommy hit me. I have coffee all over me. Why did mommy hit you? And then she kept saying, why did mommy hit me. I went into the kitchen. I yelled upstairs for Bella, Gabrielle. I come downstairs. She came downstairs. I told her that [defendant] punched me and threw coffee on us, and that I needed [A.D.] to get cleaned up and calmed down, I needed to get the kids off to school. Bella went upstairs and cleaned up [A.D.], took her to school."

Michael testified that he changed his shirt, called the police, and drove Z.D. to school. When he returned, the police were present.

¶ 6 Michael identified People's exhibit Nos. 1 through 5 as photographs taken after the incident.[1] According to Michael, People's exhibit No. 1 was a photograph of him after he changed

---

[1] People's exhibit Nos. 1 through 5 were not contained in the original record on appeal. On February 18, 2021, defendant filed a motion to supplement the record on appeal with the exhibits. Defendant asserted that the exhibits were in the State's possession and asked that we order the State to produce the exhibits and grant leave to supplement the record. The State objected, noting that defendant has taken "zero steps" to provide a complete record, that her assertion regarding the location of the exhibits was unsupported, and that her motion was untimely where the State has already filed its response brief. On February 19, 2021, we denied the motion, noting that "appellant has not actually located the exhibits and the parties have already filed briefs that presume that the exhibits are not part of the record." (Defendant filed her initial brief on December 9, 2020. The State filed its response on February 9, 2021.)

On March 1, 2021, defendant filed a second motion to supplement the record. Defendant asserted that she was informed by the Lake County Circuit Clerk's Office that the five exhibits were not part of the record. Defendant further asserted that she obtained from the Highland Park Police Department several photographs that were taken relating to the incident. Counsel contacted the assistant state's attorney who prosecuted the case to identify which photographs were admitted as exhibit Nos. 1 through 5 at trial. The assistant state's attorney did so, and counsel labeled the photographs accordingly. The assistant state's attorney signed an affidavit averring that the photographs were the same or substantially similar to those admitted at trial. Counsel attached the exhibits and the affidavit to his motion. On March 4, 2021, the State filed an objection, arguing that the exhibits should not be admitted, because both defendant and the State had already filed their briefs under the presumption that the exhibits were not part of the record.

We took the motion with the case. We now grant defendant's motion to supplement the record with the exhibits. We note that, in its brief, although the State asserted that "[i]n the absence of these critical exhibits, this Court should presume the photographs supported the trial court's verdicts," the State also discussed the exhibits, described each photograph, and argued that the photographs clearly supported the State's case. Thus, we are persuaded that the State will not be unduly prejudiced by the supplement to the record, and we grant defendant's motion. See *People v. Span*, 156 Ill. App. 3d 1046, 1053 (1987) (the reviewing court granted the defendant's motion to supplement the record with a transcript from a hearing on the defendant's motion for a new trial, even though the parties had already filed their briefs and the State had relied on the absence of the transcript, because the State's brief contained an alternative argument based on the merits of the motion for a new trial and thus it would not be unduly prejudiced by inclusion of the transcript).

his shirt. People's exhibit No. 2 was a photograph of the left side of his head showing a "mark" in the same spot that defendant "punched" him. People's exhibit No. 3 was a photograph of "the window wall that was behind where [he] was standing when [he] was struck with the coffee." The photograph showed "[t]he coffee on the windowsill, on the window floor, and the wall." People's exhibit No. 4 was a photograph of "[t]he floor of [their] house at the threshold between the mudroom where [he] was standing and walking into the kitchen area." There was coffee on the floor. People's exhibit No. 5 was a photograph showing coffee on the floor of the mudroom. The exhibits were admitted without objection.

¶ 7     On cross-examination, Michael testified that the coffee thrown at him was hot. When asked whether he sought treatment as a result of the coffee being thrown at him, he stated: "Yes, by removing my shirt and taking this coffee-soaked shirt off of me, yes." When asked if he sought medical treatment, he responded no. When asked whether he was hurt as a result of being struck by defendant, Michael stated: "Counsel, are you asking emotionally or physically?" When counsel clarified, "Physically," Michael stated, "Physically, yes." Michael stated that he "did have medical attention," and, when asked what type of medical attention he received, Michael responded: "I put ice on my head." Michael obtained an order of protection against defendant on August 22, 2019. Michael obtained exclusive possession over the house and defendant was not permitted in the house. A.D. and Z.D. remained with Michael. Michael agreed that, on August 8, 2019, he went to a meeting at defendant's lawyer's office to have a settlement conference. That conference did not take place, and no agreement was reached.

¶ 8     Idegard testified that, on August 21, 2019, she lived with defendant, Michael, A.D., and Z.D. At 8 a.m. that morning, she was folding laundry with Michael. Defendant came upstairs and then went back downstairs. Michael followed defendant downstairs. Eventually, Idegard heard

A.D. yelling and then heard Michael called Idegard's name. Idegard went downstairs and saw Michael and A.D. "covered in coffee." Idegard brought A.D. upstairs to shower her and put new clothes on her. When Idegard was helping A.D., Idegard saw that "[s]he was red on one of her arms." When Idegard went back downstairs, she saw coffee in the mudroom.

¶ 9    On cross-examination, the following colloquy occurred:

"Q. Did [A.D] ever complain to I [*sic*] that she was hurt?

A. Yes.

Q. What did she tell you?

A. That she got coffee on her and she got hit.

Q. But I asked you did she say that she was hurt?

A. Yes.

Q. What did she say was hurt?

A. Her arm and her leg.

Q. And was she treated for that? Did you treat her for that or doing [*sic*] anything for it?

A. Just shower her."

¶ 10    On re-direct examination, the State asked whether A.D. told her who threw the coffee. Idegard responded that A.D. told her that defendant threw the coffee.

¶ 11    At the close of the State's case, defendant moved for a directed verdict. The trial court denied the motion, stating that "[t]he Court finds that the credible evidence presented today is that the defendant struck the victim on the side of the head with a closed fist and threw coffee on him."

¶ 12    Thereafter, defendant testified as follows. Defendant testified that she had not stayed at the home since August 8, 2019. She explained: "Because after we had that settlement meeting and not

having a temporary parenting plan in place there was so much tension that I was scared to be at home." Defendant returned home the morning of the incident because she missed her children and wanted to take them to school, which had started two days earlier. Before returning home, she stopped in Bucktown at 6:30 a.m. to buy coffee. She purchased coffee and put "a good amount" of cold milk in it. Defendant arrived home at about 7 a.m. and walked into the "living room kitchen area." Both children ran up to her and hugged her, telling her that they were happy to see her and wanted her to take them to school. Defendant walked with the children into the kitchen and she asked Michael "to communicate with [her] about this eye doctor appointment." Defendant testified that Z.D. had previously been hospitalized for lacerations to his eyes and that he had since developed a twitch. The appointment was with a specialist. Defendant testified that she and Michael had a "shared calendar" for the children's appointments and that he made Z.D.'s appointment at a time that she was unable to attend. Michael had refused to change the appointment time because he did not want Z.D. to miss school. Defendant had also asked Michael if she could take the children to school, and he told her that she could not. Defendant testified that Michael refused to communicate with her regarding the appointment, and he walked upstairs. Defendant followed Michael upstairs, and he ignored her. She agreed that she called him an "asshole" and then went back downstairs.

¶ 13    Defendant testified that when she arrived downstairs, she brought A.D. into the mudroom to get her ready for school. A.D. was sitting on the floor and defendant was sitting on a bench putting shoes on A.D. when Michael entered the mudroom. Michael was standing "[d]irectly over [her]" and she was frightened. Michael started "talking over [her] to [her] daughter about this gymnastics trial that he had taken care of." Defendant testified that it was a "pattern" of his— " 'blocking [her]' out of [her] kids['] life and activities." Defendant "wanted to defuse the

situation" and attempted to leave. Defendant testified: "I stood up. He was in my way. I moved him out of my way, and my coffee spilled as I was doing that." Defendant denied punching Michael in the head and denied throwing coffee at him. Defendant stated that her coffee was not hot and that there was "barely any left." Defendant left and went to work. Defendant was subsequently served with an order of protection and no longer lived at the house.

¶ 14    On cross-examination, defendant testified that the mudroom was "[m]aybe" ten feet by ten feet. Defendant agreed that she made physical contact with Michael when she moved him out of the way. She was questioned about Michael's size and she stated that she did not know how tall he was or how much he weighed. When pressed, she stated that he was "a normal guy, like an average guy." She testified that she could not have just walked around him to exit the room, because she would have stepped on A.D. After she moved Michael out of the way, she spilled her coffee.

¶ 15    The trial court found defendant guilty of both counts. The court stated that it was "really struggling to remain as judicious as [it could]," noting that "both witnesses were wildly objectionable to the Court." The court stated: "Between Mr. Delrahim parsing every word [defense counsel] said[2], and [defendant's] behavior on the stand. Rarely has the Court had similar witnesses

---

[2] There were several instances during cross-examination where Michael, an attorney, told defense counsel that he did not understand the question or asked counsel to "rephrase his questions [as] intelligible." As for parsing words, when Michael was asked whether he filed for divorce on October 18, 2018, he responded: "I said I filed a petition seeking dissolution of marriage in October of 2018." Michael was also asked whether a document he was being shown was the "order of protection that [he] filed," and Michael responded, "Counsel, I didn't file an order of protection. I

before it, but that is what we do, so the Court has to take into account all the of the testimony." As for credibility, the court stated that defendant was "one of the least credible people I have ever heard in my life." The court noted that defendant had been gone from the home from August 8 through August 21 and then decided that she wanted to take the children to school, even though school had started two days earlier. The court also noted that defendant had provided no advance notice that she was returning home. The court rejected defendant's claim that she wanted to "defuse the situation," noting that she called Michael an "asshole" in front of the children, followed him upstairs where he ignored her, and then called him "asshole again[,] not defusing any situation that I am familiar with." The court also rejected defendant's claim that she was "frightened" by Michael, finding no basis for it. The court stated: "He is a tiny little man possibly 5-6. I would be surprised if he is 130 pounds. And yet she alleges herself to be frightened by his presence in the mudroom." The court noted that there was "[n]o allegation that [Michael] said or did anything to cause that fright." The court also found that defendant's inability to "decide how large [Michael]" was contributed to her lack of credibility, as did her claim that her coffee "spilled." About that claim, the court commented:

---

filed a petition asking the Court to enter an order of protection." In addition, in response to one of defense counsel's questions, Michael told counsel that he was asking Michael to speculate. Michael also stated the basis of an objection after the State objected to a question posed by defense counsel. At one point, Michael asked defense counsel if he needed the court reporter to read back a question and the court stated: "Sir, I will be in charge of what the court reporter reads back, if that is okay with you."

"The coffee is all over the windowsill which by the looks of things is two plus feet off the ground so the spilling of the coffee had force behind it, and, furthermore, apparently the unbiased witness the only really credible person in the whole thing is Gabrielle said she [*sic*] that she heard [A.D.] yelling about the coffee being spilled on her so there was some force behind this coffee, quote, unquote 'spilling.' The Court finds that that is completely fallacious."

The court concluded that the State proved both counts beyond a reasonable doubt and continued the matter to February 18, 2020, for sentencing.

¶ 16    On February 14, 2020, new counsel filed an appearance on defendant's behalf and a motion to continue the sentencing hearing. On February 18, 2020, the trial court granted trial counsel's motion to withdraw and granted new counsel leave to file his appearance. The matter was continued to March 16, 2020, for sentencing.

¶ 17    On February 28, 2020, defendant filed a motion for a new trial. Defendant acknowledged that, because the motion was not filed within 30 days of the verdict, it was untimely, but she nevertheless asked the trial court to use its discretion to address the merits, noting that the lack of a timely motion was due to trial counsel's ineffectiveness in failing to file it. The motion further alleged that trial counsel was ineffective for (1) eliciting inadmissible hearsay testimony from Idegard, (2) failing to object to hearsay statements, (3) failing to properly prepare defendant for trial, and (4) failing to adequately advise defendant that she was not required to testify.

¶ 18    The hearing on the motion took place on August 18, 2020. The record does not contain a report of the proceedings from the hearing; however, the parties have filed an agreed bystander's report and statement of facts. Over the State's objection, the court allowed the motion to be heard despite its untimeliness, and it granted defendant's oral motion to supplement the record with

several affidavits of defendant. Following arguments, the court denied the motion. According to the bystander's report, the court noted that it had "serious concerns" as to trial counsel's performance, which it found "fell below the standard of what was expected of any attorney." Nevertheless, the court found that, despite trial counsel's "concerning performance, and independent of his lapses, there was sufficient evidence to find [defendant] guilty beyond a reasonable doubt." The court indicated that it "relied on [defendant's] testimony during the trial in reaching its decision"; "recalled from the trial that [defendant] and [Michael] hated each other very much and would do anything to destroy the other"; and that "there were factual discrepancies in the evidence." The court stated that "even if the [c]ourt excluded Ms. Idegard's hearsay testimony, her other testimony was sufficient to corroborate [Michael's] story including hearing [Michael] and [A.D.] yelling from downstairs and seeing coffee on [A.D.]."

¶ 19    On September 1, 2020, the trial court sentenced defendant to 12 months' conditional discharged, with the conditions that she follow all treatment plans of her therapist and follow all court orders in her pending divorce case.

¶ 20    Defendant filed her notice of appeal on September 15, 2020.

¶ 21                                II. ANALYSIS

¶ 22    Defendant argues that she was denied her right to the effective assistance of counsel because trial counsel: (1) elicited inadmissible hearsay testimony during his cross-examination of Idegard, which incriminated defendant and also broadened the scope of the State's redirect, allowing it to elicit testimony that corroborated Michael's version of the events; and (2) failed to advise defendant of her right not to testify. In response, the State argues first that defendant forfeited her allegations by failing to raise them in a timely posttrial motion. Alternatively, the

State contends that defendant's ineffectiveness claims fail because she cannot establish prejudice. We agree with the State's alternative argument.

¶ 23    We first address the State's argument that defendant has forfeited her claims, because she filed her motion for a new trial on February 28, 2020, more than 30 days after the trial court found her guilty. Section 116-1(b) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/116-1(b) (West 2018)) provides that a motion for a new trial "shall be filed by the defendant within 30 days following the entry of a finding or the return of a verdict." The State contends that, because defendant failed to comply with section 116-1(b) of the Code, she has forfeited her arguments. See *People v. Enoch*, 122 Ill. 2d 176, 187 (1988) (explaining that the "[f]ailure to specify grounds for a new trial in writing in a motion for a new trial has been held by this court to constitute waiver of the issue on the review in the absence of plain error"). However, although this 30-day time limitation applies to defendant, "there is no jurisdictional bar to a trial court entertaining a post-trial motion not timely filed within 30 days" as prescribed by the statute if the motion was filed before the imposition of the sentence. *People v. Talach*, 114 Ill. App. 3d 813, 818 (1983) (a trial court has jurisdiction to entertain an untimely posttrial motion filed before sentencing). Here, the record reveals that trial counsel failed to file a timely motion and that it was not until defendant obtained new counsel that a motion was filed. Indeed, new counsel alleged that trial counsel was ineffective for, among other things, failing to file a timely motion for new trial. The motion was filed before sentencing, while the trial court had jurisdiction, and the court addressed the merits of the motion. Under the circumstances, we choose to address on appeal the issues raised in the posttrial motion.

¶ 24    We turn to the merits. To succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's representation fell below an objective standard of

reasonableness. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). In addition, a defendant must establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id.* If a claim may be determined on the basis that there is no prejudice, a reviewing court need not consider if counsel's performance was deficient. See *id.* at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, *** that course should be followed."); *People v. Gaciarz*, 2017 IL App (2d) 161102, ¶ 50 (courts may resolve ineffectiveness claims by reaching only the prejudice component of *Strickland*, because lack of prejudice renders counsel's performance irrelevant).

¶ 25 To prove defendant guilty of domestic battery, the State had to prove beyond a reasonable doubt that defendant knowingly caused bodily harm to Michael by striking him about the body (count I) (see 720 ILCS 5/12.3.2(a)(1)) and that defendant knowingly made contact of an insulting or provoking nature with Michael by striking him about the body (count II) (see *id.* § 12-3.2(a)(2)).

¶ 26 Here, we need not consider whether defense counsel performed deficiently in eliciting the challenged testimony, because defendant cannot establish prejudice. The complained-of testimony, elicited from Idegard by defense counsel on cross-examination, established that A.D. told Idegard that she was hurt, that it was "[h]er arm and her leg" that were hurt, that "she got coffee on her," and that "she got hit." We note that this testimony makes no reference to defendant and is vague. Moreover, it is cumulative, given that Idegard had already testified that, when she was helping A.D. after the incident, she had seen that "[A.D.] was red on one of her arms" and had seen Michael and A.D. covered in coffee. Nevertheless, due to defense counsel's questioning, the State elicited testimony from Idegard on redirect examination, that A.D. told her that defendant

had thrown the coffee. Defendant argues that she suffered prejudice because "Idegard's testimony was a key piece of evidence, which the trial court relied on when finding [defendant] guilty." We disagree. To be sure, the trial court referred to Idegard as "the unbiased witness the only really credible person in the whole thing." However, when it did so, it specifically referenced only Idegard's testimony "that she heard [A.D.] yelling about the coffee being spilled on her so there was some force behind this coffee, quote, unquote 'spilling.' " (We note that Idegard did not testify that A.D. articulated, during her yelling, a complaint about coffee; rather, the trial court made the fair inference that A.D. was yelling in reaction to the coffee.) The trial court made no mention that A.D. told Idegard that defendant threw the coffee. Nor did the court ever reference Idegard's testimony that A.D. told her she was hurt or that she got hit. In any event, given the totality of the evidence, we cannot say that, without this testimony, there was a reasonable probability that the trial court would have found the evidence insufficient to prove defendant guilty beyond a reasonable doubt. Indeed, in denying defendant's posttrial motion, the court specifically found that, even if it had excluded the allegedly improper testimony, Idegard's other testimony would have been sufficient to corroborate Michael's testimony, where she testified that she heard Michael and A.D. yelling and saw the coffee on A.D. We agree.

¶ 27    Michael testified that defendant punched him with her right fist above his left temple and that she threw coffee at him using her left hand. Michael testified that the coffee hit his chest, the window, the wall, the floor, and A.D. He testified that AD. was screaming and crying and that he yelled for Idegard to come downstairs. Michael's testimony was corroborated by Idegard's properly admitted testimony and by the photographs. Idegard testified that she heard A.D. yelling and then heard Michael call Idegard's name. Idegard went downstairs and saw Michael and A.D. covered in coffee. Idegard also saw coffee in the mudroom. People's exhibit No. 2 showed the left

side of Michael's head with a "mark" where defendant "punched" him. People's exhibit No. 3 showed the wall behind where Michael was standing when he was hit with the coffee, with "coffee on the windowsill, on the window floor, and the wall." People's exhibits Nos. 4 and 5 showed coffee on the mudroom floor. Defendant claims that the photographs are "not the smoking gun the State makes them out to be, nor do they corroborate [Michael's] version of events that [defendant] threw, rather than spilled, the coffee." The court found otherwise, stating that "[t]he coffee is all over the windowsill which by the looks of things is two plus feet off the ground so the spilling of the coffee had force behind it." We agree.

¶ 28    Defendant argues that Michael was the only witness who testified that defendant punched him and threw coffee at him and that Michael's testimony was directly contradicted by defendant's testimony. Although defendant denied hitting Michael and claimed that she spilled the coffee when she was attempting to "defuse" the situation by exiting the mudroom, the trial court found defendant to be "one of the least credible people [it] [has] ever heard." The court rejected defendant's claim that she was attempting to defuse the situation, noting that defendant twice called Michael an "asshole" and followed him upstairs. The court also rejected defendant's claim that she was supposedly frightened by Michael, noting that she did not assert that he said or did anything to frighten her and also that Michael was "a tiny little man possibly 5-6" who likely weighed no more than 130 lbs. The court also expressly rejected defendant's claim that she "spilled" the coffee, noting that the coffee was "all over the windowsill which by the looks of things is two plus feet off the ground so the spilling of the coffee had force behind it." We agree with the trial court's conclusion that defendant's version of the story was "completely fallacious." See *People v. Hart*, 214 Ill. 2d 490, 520 (2005) ("If a defendant chooses to give an explanation for

his incriminating situation, he should provide a reasonable story or be judged by its improbabilities.").

¶ 29    The cases relied on by defendant in support of her ineffective-assistance claim are readily distinguishable, because in each case the improperly admitted hearsay evidence was critical evidence of the defendant's guilt. See *People v. Bailey*, 374 Ill. App. 3d 608, 614-15 (2007) (at the defendant's trial for possession with intent to deliver, where no other factors usually associated with an intent to deliver were present, defense counsel elicited testimony that was the "key" evidence linking the defendant to an unknown man standing on a nearby street corner yelling " 'rocks' " at passing cars); *People v. Moore*, 356 Ill. App. 3d 117, 129-30 (2005) (at the defendant's trial for burglary, defense counsel elicited incriminating hearsay testimony that explained the absence of the only physical evidence that would have connected the defendant to the burglary); *People v. Orta*, 361 Ill. App. 3d 342, 343, 348-50 (2005) (at the defendant's trial for possession with intent to deliver, defense counsel elicited testimony that the police had found, during a search of the defendant's home, prerecorded currency that had been used in a prior undercover drug transaction, which was "the most damaging evidence" against the defendant and provided a critical element of the State's case); *People v. Jackson*, 318 Ill. App. 3d 321, 328 (2000) (in the defendant's trial for possession with intent to deliver, where there was no evidence linking the defendant to the narcotics, defense counsel elicited testimony that, shortly after an unknown person had given the defendant money, a man standing near the defendant had reached into a bag and handed something to an unknown person, which established a "critical" element of the State's case). Here, unlike in *Bailey*, *Moore*, *Orta*, and *Jackson*, Idegard's testimony that A.D. told her that defendant threw the coffee was not similarly critical, given the totality of the evidence presented.

¶ 30    Defendant also argues that this case is similar to *People v. Park*, 245 Ill. App. 3d 994 (1993). In *Park*, which we noted was "an extremely close case" (*id.* at 1004), we identified multiple trial errors, some of which were committed by defense counsel, and we reversed the defendant's conviction for sexually abusing his minor daughter and remanded for a new trial. One of those errors, highlighted here by defendant, was that defense counsel elicited testimony from the victim's friend and a police officer that the victim had told them that the defendant sexually abused her. We reasoned that "where there is no evidence against [the] defendant except that found in the accusation of the victim, there is a danger that the jury's verdict was the result of hearing the victim's version more than once." *Id.* at 1003.

¶ 31    *Park* is distinguishable because, in that case, there were multiple errors committed by both trial counsel and the court. Besides the error defendant highlights, there were errors including (1) the admission of a variety of other-crimes evidence without a limiting instruction (the first error we identified in our analysis), which we found created the "potential *** for great confusion on the part of the jury" (*id.* at 1002-03); and (2) the admission (which defense counsel did not object to) of a letter written by the victim to the defendant, accusing him of sexual molestation, and the publication of that letter to the jury (*id.* at 1004-05). We specifically noted that we "[did] not determine whether any single flaw, by itself, would require reversal"; rather, "collectively, the errors were sufficient to deprive defendant of a fair trial." *Id.* at 1006.

¶ 32    The single error that defendant alleges here does not rise to the level of the errors committed in *Park*. As the trial court noted in denying defendant's motion for a new trial, there was sufficient evidence, apart from Idegard's hearsay testimony, to corroborate Michael's testimony and support *defendant's* convictions.

¶ 33　Similarly failing for lack of prejudice is defendant's claim that she was denied the effective assistance of counsel based on counsel's failure to advise her of her right not to testify. See *People v. Hernandez*, 351 Ill. App. 3d 28, 39 (2004) (affirming the dismissal of defendant's postconviction petition when he could not show he was prejudiced by trial counsel's alleged violation of his right to choose whether or not to testify). Defendant argues that, "[a]bsent her testimony, the trial court would have been left with [Michael's] version of events, his 'objectionable' testimony, and his bias as a husband in the middle of a contentious divorce who was 'parsing every word' that '[trial counsel] said.' " We disagree. While the trial court found that defendant's testimony was not credible, we cannot say that the defense was better off without it. Rather, without defendant's version of the events, the trial court would have been left with Michael's unrebutted testimony of the events, which was largely corroborated by Idegard's admissible testimony and the photographic evidence.

¶ 34　In light of the foregoing, we cannot say that there is a reasonable probability that the result of the trial would have been different absent trial counsel's allegedly deficient performance. Therefore, defendant's ineffectiveness claims fail for lack of prejudice.

¶ 35　　　　　　　　　　　　　　　III. CONCLUSION

¶ 36　For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 37　Affirmed.